IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
DIVISION

| | | |
|---|---|---|
| IN RE: § | | |
| PHILIP SERVICES CORP., § | | CASE NO. 03-37718-H2-11 |
| Debtor § | | |
| _____ § | | |
| § | | |
| H. MALCOLM LOVETT, § | | |
| Plaintiff § | | |
| § | | |
| vs. § | | ADVERSARY NO. 05-3440 |
| § | | |
| HOMRICH INC., § | | |
| Defendant § | | |

## MEMORANDUM OPINION
## FINDINGS AND CONCLUSIONS
## REGARDING DISMISSAL OF ADVERSARY PROCEEDING WITH PREJUDICE

In this adversary proceeding, the Trustee seeks to recover $936,741.35 paid by the Debtor to Homrich, Inc. ("Homrich") by wire transfer prior to the filing of the bankruptcy case. The Trustee alleges that the payment was a preference that the Trustee can recover under 11 U.S.C. § 547. The dispute was submitted on stipulated facts. Because the Court concludes that the wire transfer was a contemporaneous exchange for new value, the Trustee's complaint is dismissed with prejudice by separate judgment issued this date.

## JURISDICTION

This is an adversary proceeding, a civil proceeding, arising in a case under title 11 and arising under title 11 of the United States Code. The United States District Court has jurisdiction under 28 U.S.C. § 1334(b) and (e). By Order dated August 9, 1984, superceded by General Order 2005-6 on March 10, 2005, under authority granted by 28 U.S.C. § 157(a), the United States District Court for the Southern District of Texas referred all such proceedings to the bankruptcy judges for the district. This is a core proceeding as defined by 28 U.S.C. §157(b)(2)(F). The bankruptcy judge may hear and may determine core proceedings, 28 U.S.C. §157(b)(1). No party has objected to the exercise of core jurisdiction by the undersigned bankruptcy judge.

# STIPULATED FACTS

## Trustee's Authority to Bring This Adversary Proceeding

On June 2, 2003, Philip Services Corporation ("PSC"), and forty-three (43) affiliated subsidiaries (collectively the "Debtors") filed voluntary petitions for relief under Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

By Order entered December 11, 2003, the Bankruptcy Court confirmed the Debtors' Second Amended and Restated Joint Plan of Reorganization (the "Plan"). The Plan has become effective.

In Article 8.12 the Plan created a "Liquidating Trust," and H. Malcolm Lovett, Jr. was appointed trustee ("Trustee") of the Liquidating Trust. The Plan transferred Bankruptcy Code Chapter 5 avoidance actions to the Liquidating Trust. The Trustee is authorized to enforce, to prosecute, and to settle such claims. Therefore, the Liquidating Trust is authorized to prosecute this adversary proceeding.

## Contract Between Debtor and Homrich

Philip Environmental Services Corporation, entered into a Construction Contract to construct a powerhouse for Ford Motor Company and Rouge Steel Company, ("Ford/Rouge") on property owned by them at 3001 Miller Road, Dearborn, Wayne County, Michigan (the "Ford/Rouge Steel Plant"). Philip Environmental Services Corporation entered into a Subcontract with Homrich to demolish the existing building on the property (Homrich Exhibit 1). The total Subcontract price was $2,239,841.00 and was payable in draws.

Homrich completed the demolition work by the end of February 2003. Philip Services Corporation had made interim payments to Homrich, but the majority of the Subcontract price was unpaid when the demolition was complete. On May 9, 2003, Homrich filed a Claim of Lien (Homrich Exhibit 23) in the amount of $1,279,758.89 against the Ford/Rouge Steel Plant. The lien was filed in the records of the Wayne County Register of Deeds. Homrich also served notice of non-payment on Debtor (Homrich Exhibit 55) and on Ford/Rouge (Homrich Exhibits 56, 57 and 58).

Paragraph 8.5 of the contract between Ford/Rouge and Debtor allowed Ford/Rouge to withhold payment from Debtor if an unpaid subcontractor filed a lien claim (Homrich Exhibit 73, page 25, Section 8.5).

In addition, Ford Motor Company General Conditions for Construction and Installation (Homrich Exhibit 74), page 11, Paragraph 11 requires Debtor to keep the job lien free and again allows Ford/Rouge to withhold payment from Debtor sufficient to pay any liens that might be filed.

**Payment Alleged To Be A Preference**

On or about May 15, 2003, Debtor delivered to Homrich a letter that stated, in part:

Contractually, we are obligated to issue payment to you within 15 days of receiving payment from Ford Motor Company and/or Rouge Steel. Retention is to be held until the end of the project and released after conditions for release have been verified and all PSC back-charges applied. This check represents all payments contractually owed to you at this time, as well as an overpayment of $190,919.05 applied to your invoices P-02009/08 and P-02009/09. We have not yet received payment from Ford or Rouge for our associated invoices and we have not yet received all of your signed lien waivers associated with these invoices.
…

The following enclosed items must be completed and signed prior to receiving this check:
• Contract Change Order #4
• Unconditional Lien Waiver
• Conditional Lien Waivers totaling $166,743.78
• Sworn Statement

On May 22, 2003, Martin hand delivered to Homrich check number 26095 in the amount of $936,741.35. Homrich prepared and executed a written Waiver of Construction Liens. The waiver was conditioned on availability of sufficient funds to cover the check. Homrich delivered the Waiver of Construction Liens to the Debtor (Homrich Exhibit 27).

The next day, May 23, 2003, Roger I. Homrich, the president of Homrich, Inc., personally presented the check for payment at the Southwest Bank of Texas, the bank on which it was drawn. The President of the bank told him that there were insufficient funds to honor the check.

Roger Homrich then called Philip Services Corporation and spoke to David Andrews—at the Debtors' headquarters in Houston. Homrich threatened to fly to Houston unless the Debtors wired him the money. Andrews assured Homrich that the funds were available and that the check would be paid if Homrich would negotiate the check through normal banking channels. But Homrich demanded immediate payment  Andrews then authorized and caused the sum of $936,741.35 to be wire transferred to Homrich's bank account. At the time of the wire transfer, Andrews did not know that Homrich, Inc. had signed a conditional waiver of construction lien. (Homrich Exhibit 26).

**Debtor's Statement to this Court Concerning Lien-Entitled Subcontractors**

About a month after the bankruptcy petition date, July 18, 2003, Philip Services Corporation filed with the Bankruptcy Court the Debtor's Expedited Motion for Order Authorizing Payment of Additional Critical Vendor Claims (docket number 250). In that motion, Debtor asked the court to authorize Philip Services to make payments to certain subcontractors who had filed liens against the project owners' property to secure payment of

outstanding obligations owed to them. The motion stated:

## REQUEST FOR RELIEF

15. In the course of their businesses, ISG and PSD employ subcontractors on their projects who are entitled, under applicable state law, to assert liens against the project owner's property to secure repayment of any outstanding obligations owed to them by the Debtors. During the prepetition period, the Debtors undertook a lengthy process of identifying and selecting lien vendors that were vital to their businesses. The resulting list was critically examined by the division heads and then, at a second level, by members of the corporate management team, with significant paring at each level. As a result of this process, the Debtors determined that payments to lien vendors in the aggregate amount of no more than $2.2 million were needed to avoid potentially severe disruptions to the Debtors' businesses. However, after entry of the Final Order, the Debtors' were informed by existing customers that additional subcontractors had either placed liens or threatened to place liens on their property as a result of unpaid prepetition services.

16. The Debtors subsequently identified 439 Lien Vendors spanning eleven states that have either asserted or attempted to assert Lien Claims against the real and personal property of their Debtors and their customers. The Debtors and their counsel have analyzed the Lien Claims and have concluded that the Lien Vendors have arguably strong lien claims for unpaid equipment and services that they provided the Debtors. In particular, the Lien Vendors have contributed to work done by the Debtors that either (i) aided in the improvement of real property of the Debtors' customers or (ii) was permanently incorporated into the real property of the Debtors' customers.

17. <u>The threat of the Lien Claims presents a grave harm to the Debtors as an ongoing concern.</u> Out of the 439 Lien Vendors, 310 have either asserted or attempted to assert Lien Claims against ISG, relating to a total of $5.2 million of unpaid prepetition services. <u>If these Lien Vendors are not paid, ISG will be exposed to a potential annual loss in revenue of $156.8 million.</u> The remaining 129 Lien Vendors have either asserted or threatened to assert lien rights against PSD relating to a total of $1.3 million of unpaid prepetition services. <u>If these Lien Vendors are not paid, PSD will be exposed to a potential annual loss in revenue of $60 million.</u> In addition, for both ISG and PSD, certain account payors have refused to pay for services rendered unless they first receive required lien waivers. <u>These unpaid Lien Claims could have a severe impact on the revenue stream, receivables and payables of the Debtors, and thus, could affect any potential sale (or sales) of the businesses to potential bidders.</u> (Emphasis supplied.)

The Debtors prepared a list titled "Vendors with Lien Rights" which listed the construction lien vendor claims (Homrich Exhibit 64). The list of Vendors with Lien Rights identified for each creditor the "Amount the Vendor Can Lien." Homrich's then remaining unpaid claim in the amount of $331,845.01 was included in the Debtor's list of Vendors with Lien Rights.

On August 11, 2003, based on representations of potential dire harm from nonpayment of

prepetition subcontractor claims and potential liens and withholding of retainage, the Court authorized Debtor to pay some of these prepetition claims (docket number 653, Homrich Exhibit 36).

On August 27, 2003, Homrich executed a Release and Discharge of Construction Lien for its Claim of Lien upon the Ford/Rouge Plant.

On October 27, 2003, the Debtor filed its Second Amended and Restated Joint Plan of Reorganization (docket number 1047). Article 15 of the Debtor's Second Amended and Restated Joint Plan of Reorganization set forth conditions which must occur for the plan to be effective (Homrich Exhibit 45) including Paragraph 15.1.7 which requires that

> $3.8 million of payments (in addition to critical vendor payments made prior to October 16, 2003) shall have been made by the Debtors on or before the Effective Date under the lien vendor related critical vendor program.

Paragraph 15.1.7 refers to the Debtor's list of Vendors with Lien Rights which included Homrich's remaining claim of $331,845.01 in the list of the amounts for which the vendors can lien which totaled $3,830,538.04 (Homrich Exhibit 64).

On December 10, 2003, the Court entered its Order confirming the Debtor's Second Amended and Restated Joint Plan of Reorganization (docket number1713, Homrich Exhibit 69).

**Final Payment to Homrich**

On or about December 22, 2003, Philip Services Corporation sent its check number 34975 dated December 22, 2003 in the amount of $343,017.47 to Homrich (Homrich Exhibit 51) in payment of the remaining balance of Homrich's Subcontract.

The final payment to Homrich was made pursuant to the authorization granted to the Debtor to pay lien claimants in the Order entered on August 11, 2003 (docket number 653) and was made pursuant to the provisions of the Order which confirmed the Debtor's Second Amended and Restated Joint Plan of Reorganization and the provisions of Paragraph 15.1.7 of the Plan concerning payment of the claims of construction lien vendors as a condition to confirmation of the Plan.

**Debtor's Cash Management Practices Pre-Petition**

Prior to the Petition Date, the Debtors operated their businesses under a complex financing and cash management system.

Debtors maintained a loan facility with Foothill Capital Corporation ("Foothill Capital"), Foothill Partners III, L.P., Foothill Income Trust, L.P., Abeleco Finance LLC, Madeline LLC and Meadow Walk Limited Partnership (collectively, "Lenders")  Foothill Capital acted as agent (the "Credit Facility"). The Lenders advanced funds to the Debtors based on the available borrowing base under the Credit Facility.

Debtor's cash management system included approximately 155 bank accounts at 21 different banks.

Deposits into the cash management system were administered as follows. Receipts were deposited daily into one of three lockbox accounts (collectively, the "Lockbox Accounts"). The Lockbox Accounts were controlled by Foothill Capital; Debtors never had access to amounts deposited in the Lockbox Accounts. The balances in the Lockbox Accounts were transferred daily to a cash concentration account at Southwest (Account No. 156329) (the "Deposit Concentration Account"). The Deposit Concentration Account was swept daily into an account maintained with Foothill Capital, and the funds were used to reduce the outstanding balance owed under the Credit Facility. The Deposit Concentration Account is an account in Foothill's name.

Disbursements from the cash management system were administered as follows. Each day, the various Debtors advised the treasury department of their cash requirements. The treasury department compiled the daily requests and requested an aggregate total disbursement from the Lenders as an advance against the Credit Facility. Foothill deposited the funds into a master corporate concentration account (the "Master Account") at Southwest. From the Master Account, the treasury department would wire transfer the necessary funds to various division concentration accounts. Daily disbursements were made by the various Debtors from funds wire transferred to them from the Master Account.

On May 23, 2003, Debtors requested an aggregate total disbursement from the Lenders under the Credit Facility in the amount of $3,500,000. The requested funds were transferred by the Lenders to the Master Account and transferred from the Master Account to various zero balance division concentration accounts in accordance with the daily requests.

The source of all funds in the Master Account on May 23, 2003, was the draw on the credit facility from Foothill.

Of the available funds, $1,103,283.99 was transferred to a zero balance division concentration account (Account No. 128104) at Southwest. The funds were used to pay various expenses and insurance premiums including the wire payment to Homrich. Prior to the transfer of the $1,103,283.99 the zero balance division concentration account had a zero balance.

**Payments by Ford/Rouge**

On and before May 23, 2003, Ford Motor Company and Rouge Steel Company made payments to Philip Services Corporation in amounts greater than $24,939,468.22. These payments were for all projects among Philip Services Corporation and its subsidiaries, and Ford/Rouge.

On and after May 23, 2003, the amounts due or to become due by Ford and Rouge Steel to the Debtor, including the retainage, was at least $1,151,151.69. These payments were for all

projects among Philip Services Corporation and its subsidiaries, and Ford/Rouge.

On and before May 23, 2003, Ford/Rouge made payments owed to the Debtors that were related to the Homrich project in an amount sufficient to pay all but $147,495.71 of the $936,741.35 wire transfer.

**Insolvency, Status as a Creditor, Balance Due Homrich, Anticipated Recovery by Unsecured Creditors**

On the date of the wire transfer, the Debtor was insolvent and Homrich was a creditor of the Debtor.

The wire transfer was for or on account of an antecedent debt owed by the Debtor to Homrich before such transfer was made and was made within 90 days prior to the bankruptcy petition date.

On the date of the Debtor's petition, the remaining balance owed to Homrich was $331,845.01.

The Trustee anticipates that distributions to general unsecured creditors under the Plan will be no more than 2 to 3 % of the face amount of their claims.

# DISCUSSION

**Preferential Transfers:**

Section 547(b), (c) and (g) of the Bankruptcy Code read, in pertinent part, as follows:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
   (1) to or for the benefit of a creditor;
   (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
   (3) made while the debtor was insolvent;
   (4) made-
      (A) on or within 90 days before the date of the filing of the petition; or
   (5) that enables such creditor to receive more than such creditor would receive if--
      (A) the case were a case under chapter 7 of this title;
      (B) the transfer had not been made; and
      (C) such creditor received payment of such debt to the extent provided by the provisions of this title . . .
(c) The trustee may not avoid a transfer . . . to the extent that such transfer was intended by the debtor and the creditor . . . to be a substantially contemporaneous exchange for new value . . . and in fact a substantially contemporaneous exchange.
(g) [T]he trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section . . .

11 U.S.C. § 547.

In a very professional way, counsel have stipulated the preceding facts and have limited the issues submitted to the Court to the following:

Homrich contends that the transfer was not preferential and therefore not avoidable because the funds transferred to Homrich were not the property of the Debtor. Homrich contends that the funds were held in trust by Debtor under the Michigan Building Contract Trust Fund Act ("MBCTFA"). Homrich also contends that it received no more than it would have received in a chapter 7 case because Homrich had filed a lien and because Ford/Rouge had the right to withhold funds from the Debtor to pay construction liens. Finally, Homrich alleges that release of the lien in exchange for the payment was a substantially contemporaneous exchange for new value to the Debtor. The Court addresses each of these, in turn, below.

## CONTESTED ISSUES OF LAW

**I.       The sum of $936,741.35 that Debtor paid to Homrich was property of the Debtor. (11 U.S.C. § 547(b)).**

The Trustee has the burden of proving that the money transferred to Homrich was property of the Debtors. It is stipulated that the funds were borrowed by the Debtor from Lenders on the day that they were wire transferred to Homrich.

### A.       PROPERTY RIGHTS OF A BANKRUPTCY ESTATE ARE DETERMINED BY STATE LAW.

Section 547(b) allows the trustee to avoid a transfer only to the extent that the transfer was an "interest of the debtor in property." This phrase "an interest of the debtor in property" is not defined in the Bankruptcy Code, but the Supreme Court provides guidance:

> Because the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate - the property available for distribution to creditors - "property of the debtor" subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.

*Begier v. I.R.S.*, 496 U.S. 53, 58 (1990).

Section 541(a)(1) provides that the estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." Section 541(d) provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest... becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

"Because the debtor does not own an equitable interest in property he holds in trust for

another, that interest is not property of the estate. Nor is such an equitable interest "property of the debtor" for purposes of § 547(b)." *Begier*, 496 U.S. at 59.

"Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979).

Homrich alleges that the funds that it received from the Debtor were held under a statutory trust created by Michigan law: under the Michigan Building Contract Trust Fund Act ("MBCTFA"). Mich.Rev.Stat. § 570.151-53, which provides:

> 570.151 Building contract fund; status as a trust fund.
>
> Sec. 1. In the building construction industry, the building contract fund paid by any person to a contractor, or by such person or contractor to a subcontractor, shall be construed by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes.
>
> 570.152 Building contract fund; fraudulent detention or use by contractor or subcontractor, penalty
>
> Sec. 2. Any contractor or subcontractor engaged in the building construction business, who, with intent to defraud, shall retain or use the proceeds or any part thereof, of any payment made to him, for any other purpose than to first pay laborers, subcontractors and materialmen, engaged by him to perform labor or furnish material for the specific improvement, shall be guilty of a felony in appropriating such funds to his own use while any amount for which he may be liable or become liable under the terms of his contract for such labor or material remains unpaid, and may be prosecuted upon the complaint of any persons so defrauded, and, upon conviction, shall be punished by a fine of not less than 100 dollars or more than 5,000 dollars and/or not less than 6 months nor more than 3 years imprisonment in a state prison at the discretion of the court.
>
> 570.153 Building contract fund; evidence of fraudulent detention or use.
>
> Sec. 3. The appropriation by a contractor, or any subcontractor, of any moneys paid to him for building operations before the payment by him of all moneys due or so to become due laborers, subcontractors, materialmen or others engaged to payment, shall be evidence of intent to defraud.

In *Selby v. Ford Motor Co.*, 590 F.2d 642 (6th Cir. 1979), the court stated that "[w]e agree with the Michigan courts and agree that federal bankruptcy laws should recognize and enforce the property rights created by state law under the Michigan Statutory Trust." 590 F.2d at

647.

If funds received by the debtor or the trustee are impressed with a trust for laborers and materialmen, the laborers and materialmen may claim their equitable interests in the trust fund through bankruptcy court proceedings. *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135-36 (1962).

"The statute imposes a duty upon the trustee to use the money in the building contract fund to first pay laborers, subcontractors and materialmen on the particular project for which the funds were deposited before he uses the fund for any other purpose." *In re Johnson*, 691 F.2d, 249, 252 (6th Cir. 1982); *Huizinga v. U.S.*, 68 F.3d 139, 144 (6th Cir. 1995).

It is undisputed that on or before May 23, 2003, Ford and Rouge Steel had made payments to Debtors that were related to the Homrich project in an amount sufficient to pay all but $147,495.71 of the $936,741.35 payment. Debtors received the payment as a trustee under MBCTFA and accordingly, the funds received were impressed with a trust when received.

> 1. *Imposition of the MBCTFA to defeat a bankruptcy estate's interest in commingled funds requires tracing*

(a) Homrich Argues that Tracing is Not Required

MBCTFA is silent as to whether the Act requires the beneficiary to trace the funds.

Homrich argues that it is not necessary to trace specific funds from the owner to the contractor and thereafter to identify the funds in the hands of the contractor. Homrich cites *In re Imperial Tile and Carpet*, 94 B.R. 97 (Bankr. W.D. Mich. 1998), for the proposition that tracing is not required. In *Imperial*, during the preference period a carpet subcontractor paid insurance premiums due under the union contract with its employees. The bankruptcy court brushed aside the Sixth Circuit's "tracing" language in *Selby* (*infra*) in a curious way. It concluded that tracing is required only when the funds in question are in the possession of a bankruptcy debtor postpetition, not when the contractor paid out the funds prepetition. That is a curious interpretation of *Selby* because *Selby* did not involve postpetition funds, and *Selby* did not itself make any such distinction.

*Selby v. Ford Motor Co.*, 590 F.2d at 644 (6th Cir. 1979) interprets the Bankruptcy Act, not the Bankruptcy Code.[1] In *Selby,* Frimberger (the debtor) contracted with Ford to build and to install conveyors. Frimberger employed sixteen subcontractors. Frimberger authorized Ford to pay fourteen of the subcontractors directly and to offset the payments from the balance due Frimberger. Frimberger paid the remaining two subcontractors, and then Ford paid Frimberger the balance due on its contract. Frimberger then filed "a voluntary petition for an arrangement under Chapter XI of the Bankruptcy Act" and the trustee sued to recover all sixteen payments as preferential payments. The only issue addressed by the Sixth Circuit was whether the MBCTFA

---

1 Nevertheless, the issues involved (as to classification of property of the estate) do not appear to be materially different. In addition, the *Selby* Court looked to the Bankruptcy Code (which it referred to as the "new Bankruptcy Act" and concluded that the Bankruptcy Code contained additional authority supporting the holding that it reached.

had any effect in bankruptcy cases, and if it did, whether that effect was to create a statutory lien or to create a trust which prevented payments to a contractor from being classified as property of the estate. The court held that the MBCTFA created an interest properly classified as a "traditional trust", that this classification by state law prevented the payments from being classified as property of the estate, and that "at least so long as the beneficial interests are traceable" to the owner of the project, the payments did not constitute property of the estate. *Id*. at 649. The "traceable" comment appears to be dictum, or at best a comment not intended to be significant in the case under consideration since that (almost parenthetical) reference is the only discussion of "tracing" in the opinion.

In *First Federal of Michigan v. Barrow*, 878 F.2d 912 (6th Cir. 1989), the trustee sought to avoid preferential payments from a commingled general account. The defendants cited *Selby* for the proposition that there was no burden to trace the funds that were fraudulently commingled. The court dismissed that argument as misplaced. "*Selby* is easily distinguished from the instant case in that tracing within the context of commingled funds was not an issue that was joined, addressed, considered or discussed in that disposition." *Id*. at 915. Although *First Federal* involves a constructive trust, the rule is applicable to express or statutory trusts as well.

(b) But Most Courts Require Tracing

"As a general rule, any party seeking to impress a trust upon funds for purposes of exemption from a bankrupt estate must identify the trust fund in its original or substituted form." *Id*. (citing *Danning v. Bozke (In re Bullion Reserve of North America)*, 836 F.2d 1214 (9th Cir. 1988), *cert denied*, 486 U.S 1056 (1988) (requiring tracing for express trust where funds had been commingled)).

In *Blair v. Trafco Products, Inc.*, 142 Mich. App. 349, 369 N.W.2d 900 (Ct. App. Mich. 1985), the court held that a bank had no right of setoff in funds on deposit because they were traceable to payments made in trust under the MBCTFA. In that case, the bank made business loans to a contractor secured by the contractor's assets. A landowner entered into a contract with the contractor to construct a commercial building. The landowner paid the contractor $15,000 which the contractor deposited in the bank. The contractor defaulted on its loan, and the bank exercised its right of setoff seizing the contractor's account. The landowners sued the bank to recover the funds. *Blair* held that the funds were held in trust under the MBCTFA because the landowners sufficiently traced the $15,000 to the contractor's account. The case illustrates: first, that "[t]he act does not mandate any particular method of handling trust funds..." *i.e.* that there is no prohibition against the commingling of funds, *Id*. at 354, and second, that when funds are commingled, the act requires tracing, *Id*. at 355.

"The rule is that a trust fund may be followed and the trust impressed upon property into which a fund may be traced." *Distral Energy Corp. v. Michigan Boiler & Engineering Co. (In re Michigan Boiler & Engineering Co.)*, 171 B.R. 565, 570 (Bankr. E.D. Mich. 1993). Citing *Imperial,* Homrich distinguishes *Michigan Boiler* on the basis that *Michigan Boiler* did not involve a pre-petition transfer. But if "an interest of the

debtor in property" means property that would become "property of the estate," *Begier*, *supra*, then it is irrelevant whether the transfer was pre or postpetition. The question is whether a trust beneficiary can defeat a bankruptcy debtor's claim to funds by assertion of state law trust rights, and the courts that have considered the question, except for *Imperial*, universally agree that the trust beneficiary must be able to trace the funds.

(c) Lowest Intermediate Balance Rule

Under Michigan law, when mingling of trust funds with other funds occurs, the beneficiary has a lien upon the entire fund so long as the lowest intermediate balance in the account is equal to or greater than the amount received in trust. *Blair*, 142 Mich.App. at 354.

> The rule is that a trust fund may be followed and the trust impressed upon property into which the fund may be traced. The rule is the same when the fund cannot be traced into specific property and it is sought to impress the trust upon the cash in possession of the trustee. But in the latter case the rule is aided by a legal fiction. If the trustee maintains an uninterrupted cash balance equal to or greater than the trust fund, the law raises the presumption that, although he is a trustee ex maleficio, he nevertheless is comparatively honest and has kept the trust fund intact and in cash. But, of course, such fiction and presumption can exist only if the cash kept on hand equals or exceeds the total of all like trust funds. The rule and fiction are amply discussed in *American Employers Ins. Co. v. Maynard*, 247 Mich. 638, 226 N.W. 686 (Mich. 1929); *Reichert v. United Savings Bank*, 255 Mich. 685, 239 N.W. 393 (Mich. 1932); *Reichert v. Fidelity Bank & Trust Co.*, 261 Mich. 107, 115, 117, 245 N.W. 808 (Mich. 1933); *Reichert v. Lochmoor State Bank*, 272 Mich. 433, 262 N.W. 386 (Mich. 1935); *Intercollegiate Alumni Club v. Kirchner*, 272 Mich. 466, 262 N.W. 285 (Mich. 1935).

Under the complicated banking system utilized by the Debtors, cash was received into lockboxes to which Debtors had no access. The funds were ultimately consolidated into a single Deposit Concentration Account. The Deposit Concentration Account was swept daily to a zero balance. Therefore, even a "lowest intermediate balance" analysis would not support Homrich's argument.

> **2.    Conclusion:  The MBCTFA does not defeat Plaintiff's claim because the funds paid to Homrich did not come from Ford/Rouge**

Tracing is made truly impossible under the facts under consideration in this case because the payments to Homrich did not come from Ford/Rouge. The payments from Ford/Rouge were paid to Lenders on Debtors' loan. The money that was subsequently transferred to the Master Account and to Debtor's Zero Balance account for wire transfer to Homrich came from a new loan from Lenders to Debtor. The funds received from Ford/Rouge in trust were paid to Lenders, not to Homrich.

Homrich's Trial Brief argues that out of the $936,741.35 payment, at least $789,245.64

of the funds were, in fact, traceable to funds received by the Debtor from Ford/Rouge. What is stipulated is that on and before May 23, 2003, Ford and Rouge Steel had made payments owed to the Debtors that were related to the Homrich project in an amount sufficient to pay all but $147,495.71 of the $936,741.35 payment. That stipulation is not sufficient to trace the Ford/Rouge payments to funds in Debtors' accounts.

### C. THE FUNDS WERE NOT EARMARKED BY LENDERS TO PAY HOMRICH.

Homrich asserts that the "earmarking" doctrine shields it from preference liability. The Court disagrees.

*Coral Petroleum, Inc. v. Banque Paribus-London*, 797 F.2d 1351 (5th Cir. 1986), defines the concept of earmarking but sets requirements that are not satisfied in this case.

> In cases where a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are clearly "earmarked."

*Id*. at 1356 (quoting 4 Collier on Bankruptcy ¶ 547.25 at 547-(101-102) (15th ed. 1986)).

Earmarking applied in *Coral Petroleum* because the $35,000,000 repayment of Coral's loan was made by Leeward, a third party, and not Coral. At no time did Coral have general control over the funds whereby it could independently designate to whom the money would go. 797 F.2d at 1362 n. 12 (explaining that doctrine of "earmarking" cannot be invoked where debtor "had absolute control over [the] funds [and claimant] had no legal right to force him to make an endorsement").

The source of the funds wire transferred to Homrich was a loan from Foothill. There is no evidence that Foothill (the Debtor's lender) required or instructed the Debtors to use the proceeds of the loan to pay Homrich, and the evidence shows that the Debtors were not required to use the borrowings to pay Homrich. The parties stipulated that "[t]he Debtors had control over and discretion to use the proceeds of authorized borrowings from Foothill to pay certain operating expenses of the corporate enterprise."

### II. The payment enabled Homrich to receive more from the estate than it would receive if the case were a case under Chapter 7 (11 U.S.C. § 547(b)(5)).

The Trustee has the burden of proof on this issue. The parties stipulated that Homrich was paid 100% of its claim while general unsecured creditors received 2-3% of their claims under Debtor's chapter 11 plan.

### A. CHAPTER 7 RECEIPTS IS THE TEST, NOT CHAPTER 11.

The gist of Homrich's argument is that if the prepetition wire transfer had not been made, Homrich would nevertheless have received full payment under Debtor's postpetition critical vendor program.

Homrich misses the statutory test. The question is not whether Homrich would have been paid in full under the terms of the chapter 11 plan in this case. The test is whether Homrich would have been paid in full in a hypothetical chapter 7 case.

It was stipulated that unsecured creditors are receiving 2% to 3% of their claims in this chapter 11 case. One of the tests of plan confirmation is that the plan pays all creditors (other than those who affirmatively accept the plan) more than they would receive in a chapter 7 liquidation. Bankruptcy Code § 1129(a)(7)(A)(ii). Therefore, in confirming this plan, the Court has already adjudicated that the 100% payment that Homrich received is more than they would have received as an unsecured creditor.

### B. THE TEST IS WHAT HOMRICH WOULD HAVE RECEIVED FROM A CHAPTER 7 TRUSTEE, NOT WHAT FORD/ROUGE WOULD HAVE PAID.

Homrich argues that it held a lien claim against Ford/Rouge secured by the Ford/Rouge plant. In the "hypothetical chapter 7 test" the inquiry is what would the creditor receive from the debtor's estate if the debtor were to liquidate under chapter 7 of the Bankruptcy Code, not what the creditor would have received from a third party. The Fifth Circuit in *Krafsur v. Permian Corp. (In re El Paso Refinery, LP)*, 171 F.3d 249 (5th Cir. 1999) approached the fifth element of a preferential transfer involving unsecured creditors in two steps: 1) to what claim is the payment applied and 2) from what source the payment comes. *Krafsur* stated: "The Trustee had to establish the fifth element - as a result of the transfer, the creditor received a greater percentage recovery on its debt than it would otherwise have received had it looked solely to distribution from the Chapter 7 estate for its payment. *See* 11 U.S.C. § 547(b)(5); *Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936)."; *see also Smith v. Creative Financial Management, Inc. (In re Virginia-Carolina Financial Corp.)*, 954 F.2d 193, 199 (4th Cir. 1992) ("As the plain language of § 547(b)(5) conveys, the court must focus, not on whether a creditor may have recovered all of the monies owed by the debtor from any source whatsoever, but instead upon whether the creditor would have received less than 100% payout in a Chapter 7 liquidation."). This approach is consistent with the Fifth Circuit reasoning in *Coral Petroleum;* the fundamental inquiry is whether the transfer diminished or depleted the debtor's estate. 797 F.2d at 1355-56 (*citing* H.R. Rep. No. 595, 95th Cong. 1st Sess. 177-78 (1977), *reprinted in* U.S.C.C.A.N. pp. 5787, 6138).

Although in all likelihood Homrich would have been made whole by Ford/Rouge even had Debtor not made the transfer, the Court must focus on whether the transfer of funds would have affected other creditors in a chapter 7 liquidation. "[T]he primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment."

*Southmark Corp. v. Grosz (In re Southmark)*, 49 F.3d 1111, 1117 (5th Cir. 1995).

*Krafsur* did not deal specifically with the issue of how to treat a defendant who might be paid by a third party. However, the rule in *Krafsur* still seems applicable. Section 547(b)(5) would seem to have the Court focus on whether the defendant received more "of an interest of the debtor in property" rather than on whether defendant just received more of anything. This is consistent with the second step in *Krafsur* that looks to the source of the payment and the policy of equal distribution under the Code.

However, not all courts have taken the approach of looking to the source of the payment. *In re ML & Associates, Inc.*, 301 B.R. 195 (Bankr. N.D. Tex. 2003), mentions the greater percentage test in *Krafsur* but does not consider the source of the payment. The debtor in that case had secured a payment bond for a construction project from Hartford Fire Insurance Company. The court accepted the defendant subcontractor's argument that the payment received from the debtor was not a preferential transfer because the defendant would have been paid in full in the hypothetical chapter 7 liquidation. Although the court seems to overlook the two steps in *Krafsur*, the outcome is consistent with the *Krafsur* if: (i) the party from whom the subcontractor actually or potentially recovered had a security interest in the debtor's/estate's assets or if the third party had a right of offset against sums payable to the debtor, and (ii) if the payment of the subcontractor released that security interest or right of offset. In *Krafsur,* the payment bond was secured by estate assets and payment of the subcontractor released the lien on those assets and thus increased the amount available for unsecured creditors dollar for dollar by the amount paid to the subcontractor. Viewed this way, the result is the same as this Court reaches under the "contemporaneous new value" discussion below.

**III.     The Waiver of Construction Lien that Homrich gave to the Debtor in exchange for the payment was a substantially contemporaneous exchange for new value to the Debtor. (11 U.S.C. § 547(c)(1)).**

Homrich has the burden of proof on this issue.

Homrich asserts that its release of its lien against the real property, and the concomitant release of its claim to the account payable from Ford/Rouge to Debtors, constituted a contemporaneous exchange for new value and thus a defense to recovery of the wire transfer as a preferential transfer. Bankruptcy Code Section 547(c)(1) provides:

> c) The trustee may not avoid under this section a transfer--
> > (1) to the extent that such transfer was--
> > > (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
> > > (B) in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1).

A. **HOMRICH'S RELEASE OF ITS CONSTRUCTION LIEN WAS NEW VALUE BECAUSE THE RELEASE CAUSED FORD/ROUGE TO PAY DEBTORS CASH EXCEEDING THE AMOUNT OF THE WIRE TRANSFER.**

New value may be furnished by a third party, provided that the effect is to make the unsecured creditor body, in its entirety, whole by the third party releasing liens or otherwise increasing assets distributable to the entire unsecured creditor body. In *Matter of Fuel Oil Supply & Terminaling, Inc.*, 837 F.2d 224 (5th Cir. 1988), the debtor oil company sought to recover a payment to Gulf. Gulf argued that its release of a letter of credit (and concomitant bank release of debtor's collateral securing the letter of credit) was sufficient to establish the "contemporaneous new value" exception to preference recovery. The Fifth Circuit agreed.

The Fifth Circuit began its analysis by determining the congressional goals effected by § 547: (1) to create a disincentive for creditors to attack a financially unstable debtor, and (2) to promote equity among unsecured creditors by equalizing distributions among them pre and post bankruptcy. *Id.* at 227 (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 177-78, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6138). The defense provided by § 547(c)(1) "is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors." *Id.* at 228 (citing *In re Auto-Train Corp.*, 49 B.R. 605, 612 (Bankr. D.C. 1985)). The Fifth Circuit held that the release of the letters of credit was indeed new value.

*Fuel Oil Supply* distinguishes and criticizes *In re Dick Henley, Inc.*, 38 B.R. 210 (Bankr. M.D. La. 1984), because *Dick Henley* failed to recognize that the critical element is the release of assets from a lien or the transfer of property to the debtor as a consequence of the transaction. In *Fuel Oil Supply* the Fifth Circuit recognizes that new value may be provided by a third party as part of a tripartite transaction, and the Fifth Circuit held that the release of the letters of credit provided the debtor with tangible value when there was a concomitant release of lien. *See also, In re Powerine Oil Co.*, 59 F.3d 969 (9th Cir. 1995) (limiting "new value" to release of secured claim).

Under the terms of the prime contracts between Ford/Rouge and the Debtor, when Homrich filed its lien and gave notice of the lien, Ford/Rouge had the right to withhold funds due Debtor. This was, effectively, a lien on Debtor's account receivable from Ford/Rouge which was released, dollar for dollar, when the lien was released. The remaining balance owed by Ford/Rouge to Debtor when the lien was released was more than the amount of the wire transfer.

In multiple contested matters in this Court, Debtor has successfully asserted that creditors who even <u>potentially</u> have lien rights should be paid because failure to do so would cause the landowners to stop making payments to Debtor, and possibly terminate contracts, causing damages substantially in excess of the payments due subcontractors. In its pleadings seeking this extraordinary authority to pay subcontractor prepetition claims Debtor has effectively judicially confessed the consequences of nonpayment of lienable subcontractor claims, which consequences are so well known that they should be

subject to judicial notice. Whether or not those consequences are subject to judicial notice, they are the law of this case. Because Debtor has repeatedly obtained orders in this case that recognize the substantial value paying subcontractors who even <u>potentially</u> have lienable claims, the Court would be hard pressed to find that release of liens actually filed do not constitute new value.

The parties stipulated that when the Conditional Waiver of Lien was delivered by Homrich to the Debtor, Ford/Rouge were withholding payments from the Debtor and that the amounts of the retainage and other amounts due from Ford/Rouge to the Debtor was in excess of $1 million. The right of Ford/Rouge to withhold funds from the Debtor, and Homrich's ability to make claims against that retainage, is the functional equivalent of a lien upon those funds; Debtor's release of its rights was a contemporaneous exchange. The Debtor's estate was not diminished by the wire transfer to Homrich because Homrich's release of lien made funds available, dollar for dollar, that were being withheld from the Debtor.

### B. THE RELEASE OF LIEN WAS NOT EFFECTIVE UNTIL COMPLETION OF THE WIRE TRANSFER AND THEREFORE THE EXCHANGE WAS SUBSTANTIALLY CONTEMPORANEOUS.

The Trustee notes that the $1 million (plus) retainage owed to Debtor by Ford/Rouge was not actually paid to Debtor until after the filing of the bankruptcy petition. The Trustee contends that because the retainage was not paid until postpetition, it cannot constitute new value. *Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1284 (8th Cir.1988), holds that postpetition goods or services provided to a debtor in possession do not qualify as "new value" for purposes of § 547(c) because new value given to the debtor implies that advances of new value are only those given pre-petition, because any postpetition advances are given to the debtor's estate, not to the debtor.

That argument does not apply to this case because the "new value" that Homrich provided was not the payment of the retainage, it was the release of lien that enables the Debtor to receive the retainage. The release of lien was effectively the elimination of a security interest in Debtor's account receivable from Ford/Rouge. That release occurred on the same date as the wire transfer, prepetition.

The Trustee also argues the transfer was not actually contemporaneous because Debtor's check was dishonored. There is language in some cases that supports the Trustee's argument. *See, Morrison v. Champion Credit Corp. (In re Barefoot)*, 952 F.2d 795, 800 (4th Cir. 1991) ("Indeed, to relate the wire transfers back to the time of the certificates' release in order to make the exchange contemporaneous is to accord the very operative legal significance to bad checks that we have rejected … ."); *Goger v. Cudahy Foods Co. (In re Standard Food Serv., Inc.)*, 723 F.2d 820, 821 (11th Cir. 1984); *Stewart v. Barry County Livestock Auction, Inc. (In re Stewart)*, 274 B.R. 503, 512 (Bankr. W.D. Ark. 2002) ("A contemporaneous exchange defense cannot involve a dishonored check. When the checks were dishonored by the bank, the transactions became credit transactions and created an antecedent debt. Any subsequent payment, no matter how quickly made, would satisfy that antecedent debt."). Those cases are clearly distinguishable from the case at bar.

*Barefoot* involves the following facts. Creditor released its lien on mobile homes in exchange for debtor's check written and delivered more than 90 days before the involuntary bankruptcy petition was filed. The check was dishonored, still more than 90 days before the involuntary petition. Thirty-nine days later, within 90 days prior to the bankruptcy petition, the debtor wire transferred funds to cover the dishonored check. The critical distinction between *Barefoot* and the case at bar is that the release of lien in *Barefoot* was unconditional upon receipt of the check and occurred some 39 days prior to the wire transfer. The Fourth Circuit held that the release of lien and the wire transfer were not contemporaneous. Obviously they were not; they were 39 days apart. The Fourth Circuit also held that the wire transfer did not relate back to the date of the check. Both conclusions are irrelevant in the Homrich situation because under the facts applicable to this decision: (1) the wire transfer occurred the same day that the check was dishonored, and (2) the lien release was conditional on payment of the check, so the lien release did not occur until the wire transfer cleared, whenever that might be. Under these facts, the lien release and wire transfer are contemporaneous.

Likewise, *Standard Food Services* involves the purchase of food with a check, then the passage of 11 days between the purchase and the tender of a cashier's check to replace the contemporaneous check that was dishonored. The delivery of the food was not conditional on payment of the check. The preferred creditor's performance (delivery of food) unconditionally preceded the payment (cashier's check) by 11 days. In the case at bar, the release of lien was conditional on, and effective on, completion of the payment, which was the wire transfer.

*Stewart* involves the purchase of cattle. The debtor purchased cattle on February 19 with a check that was dishonored. The cattle sale was not conditional on payment, it was fully consummated on February 19. The dishonored check was covered by a cashier's check on March 4, 13 days later. The Court held that the sale of the cattle and the cashier's check were not contemporaneous.

*In re JWJ Contracting Co., Inc.*, 371 F.3d 1079 (9th Cir. 2004) is much closer to the fact pattern under consideration in this opinion. In that case, a subcontractor unconditionally released its lien rights in exchange for a check that was subsequently dishonored. The dishonored check was replaced with a cashier's check 19 days later. In its opinion, the Ninth Circuit reviews the applicable state statute and notes that the statute provides alternative forms for releases, some conditional and some unconditional. The decision holds that the release in that case was not a contemporaneous exchange because it was unconditional and was made prior to the preferential payment. Although not directly and definitively addressed, the opinion suggests that a conditional release, like the one Homrich gave in this case, might have sustained the new value defense.

Homrich's lien release was "conditioned on availability of sufficient funds to cover check number 00026095." The parties have stipulated that the check was dishonored because there were not enough funds. The plain language of the agreement establishes that the waiver could not have been effective until the completion of the wire transfer. Therefore the release of lien and the wire transfer were contemporaneous.

## SUMMARY AND CONCLUSION

*In re JWJ Contracting Co., Inc.*, 287 B.R. 501, 506 (B.A.P. 9th Cir. 2002), *aff'd*, *In re JWJ Contracting Co., Inc.*, 371 F.3d 1079 (9th Cir. 2004) provides an excellent summary of the law of preferences as it applies to contractor payments of subcontractors with lien rights during the preference period. Since this Court cannot improve on that summary, relevant parts are simply reproduced here.

> Section 547(c) provides defenses to an otherwise avoidable preference. For example,
>
> The trustee may not avoid under this section a transfer-
>
> (1) to the extent that such transfer was-
>
> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>
> (B) in fact a substantially contemporaneous exchange.
> 11 U.S.C. § 547(c)(1).
>
> These types of transfers are protected by the Code "because, unlike payments to unsecured creditors, they do not affect the equality of distribution of estate assets." *O'Rourke v. Coral Constr., Inc. ( In re E.R. Fegert, Inc.),* 88 B.R. 258, 259 (9th Cir. BAP 1988) (" *Fegert I* ") *aff'd Fegert II* (citation omitted).
>
> The § 547(c)(1) defense "is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors." *Lubman v. C.A. Guard Masonry Contractor, Inc. ( In re Gem Constr. Corp. of Virginia),* 262 B.R. 638, 645 (Bankr. E.D. Va. 2000) (citations omitted). Thus, for § 547(c)(1) to apply, the value given for the transfer must actually enhance the worth of debtor's estate so as to offset the reduction in the estate caused by the transfer. *Id.*
>
> "To enjoy the benefits of Section 547(c)(1), the creditor must provide new value as defined in Section 547(a)(2) in contemporaneous exchange for the debtor's payments." *Fegert I,* 88 B.R. at 259.
>
> "[N]ew value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.
>
> 11 U.S.C. § 547(a)(2). Before new value can be determined, a court must measure

"the value given to the debtor in determining the extent to which the trustee may void a contemporaneous exchange." *Sulmeyer v. Suzuki ( In re Grand Chevrolet, Inc.),* 25 F.3d 728, 733 (9th Cir.1994) (quoting *Milchem, Inc. v. Fredman ( In re Nucorp Energy, Inc.),* 902 F.2d 729, 733 (9th Cir.1990)); *see also Creditors' Committee v. Spada (In re Spada),* 903 F.2d 971, 976-77 (3d Cir.1990) (holding that a party invoking a § 547(c)(1) defense must "prove the specific measure of the new value given to the debtor" in exchange for what was received). New value is measured at the time of the transfer. *See Grand Chevrolet,* 25 F.3d at 733.

In the case at bar, Debtor has consistently and successfully asked the Court to grant the extraordinary relief of allowing it to pay prepetition lienable claims by representing that doing so provides invaluable benefit to the estate. The wire transfer in question removed the condition that Homrich placed on the release of its lien claim, providing Debtor, dollar for dollar, with tangible benefit (the right and the ability to collect its receivable from Ford/Rouge). Therefore the lien release was "new value". Since the lien release was conditional on payment of the check, and since the wire transfer paid the check, the lien release and wire transfer were exactly contemporaneous. Therefore, the Court finds that the wire transfer was a contemporaneous exchange for new value.

By separate judgment issued this date, the complaint is dismissed with prejudice.

SIGNED   December 21, 2006

*Wesley W. Steen*

_____
WESLEY W. STEEN
UNITED STATES BANKRUPTCY JUDGE